UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARCUS LOUIS CARTER,
Petitioner-Appellant,

v.

No. 99-10

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, District Judge.
(CA-97-1041-5-HC-F)

Argued: October 26, 1999

Decided: December 29, 1999

Before MURNAGHAN, WILKINS, and TRAXLER, Circuit Judges.

_____

Dismissed by unpublished opinion. Judge Wilkins wrote the opinion,
in which Judge Murnaghan and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Mark Everette Edwards, EDWARDS & FLEMING,
P.L.L.C., Durham, North Carolina; William Joseph Cotter, RIGSBEE
& COTTER, Durham, North Carolina, for Appellant. Valerie Blanche
Spalding, Special Deputy Attorney General, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appel-
lee. **ON BRIEF:** Michael F. Easley, Attorney General of North Caro-

lina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

WILKINS, Circuit Judge:

Marcus Louis Carter appeals an order of the district court denying his petition for a writ of habeas corpus,[1] in which Carter challenged his conviction and death sentence for the murder of Amelia Lewis.[2] See 28 U.S.C.A. § 2254 (West 1994 & Supp. 1999).[3] Because Carter

_____

[1] Carter named James B. French, then Warden of Central Prison where Carter is incarcerated, as Respondent. French has since been replaced as Respondent by R. C. Lee, the present Warden of Central Prison. For ease of reference, we will refer to Respondent as "the State" throughout this opinion.

[2] Carter also was convicted and sentenced to life imprisonment for the attempted second degree rape of Lewis. Carter does not appear to challenge this conviction in his habeas petition, and we do not consider it further except to note that Carter's assertions of error in the guilt phase, if meritorious, would invalidate the attempted rape conviction as well as the murder conviction.

[3] Because Carter's petition for a writ of habeas corpus was filed after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the amendments to 28 U.S.C.A. § 2254 effected by§ 104 of the AEDPA govern the resolution of this appeal. See Green v. French, 143 F.3d 865, 868 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999); see also Lindh v. Murphy, 521 U.S. 320, 336 (1997) (holding that habeas petitions filed prior to the effective date of the Act are not governed by the Chapter 153 AEDPA amendments). The State does not maintain that the provisions of § 107 of the AEDPA (including the more stringent procedural default provisions) apply.

has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C.A. § 2253(c)(2) (West Supp. 1999), we deny his application for a certificate of appealability and dismiss the appeal.

I.

The facts are set forth in detail in the opinion of the Supreme Court of North Carolina on direct appeal. See State v. Carter, 451 S.E.2d 157, 162-63 (N.C. 1994). Accordingly, we need only summarize them here. At approximately 11:22 p.m. on December 15, 1989, the Goldsboro, North Carolina Police Department received a report that a woman was screaming "please don't kill me" in the vicinity of an alley on Walnut Street. An officer who responded to the call heard and saw nothing. However, on Monday, December 18 Lewis' body was discovered in the alley by a sanitation worker. A subsequent autopsy revealed that death resulted from manual strangulation and blunt force trauma to the head; the head injury could have been inflicted with a brick. Lewis' body also bore numerous abrasions on the torso and neck and some post-mortem wounds, one of which--a tear in Lewis' liver caused by a punch or a stomp--would have been fatal had Lewis not already been dead.

Upon observing the body, Captain C. E. Boltinhouse of the Goldsboro Police Department noticed that Lewis' left pants leg had been removed and her underwear pulled down. Lewis' condition reminded Captain Boltinhouse of the description of a rape reported by Kesha Davis that had occurred approximately one hour after the screams were reported and only one block away from the location of Lewis' body. Specifically, Davis had reported that the rapist--whom she subsequently identified as Carter--had removed her left pants leg and pulled her underwear down.

Captain Boltinhouse went to Carter's mother's home, where Carter was living, to arrest him for the rape of Davis, but Carter was not there. Carter's mother was present and consented to a search of the home, during which Captain Boltinhouse found items of clothing that matched Davis' description of the clothes worn by her attacker--a green sweatshirt, a pair of jeans, and black boots. Carter subsequently was arrested and pled guilty to the rape of Davis.

Forensic evidence tied Carter to the murder of Lewis. Blood spattered on Carter's sweatshirt and jeans matched Lewis' blood but not Carter's blood. Fibers consistent with Carter's sweatshirt were found under Lewis' fingernails and on the wheel of a dumpster near Lewis' body, where the brick that had been used to bludgeon Lewis was discovered. Additionally, fingernail scrapings from Lewis and samples from Carter's sweatshirt indicated that some particles--flecks of nail polish--had originated from the same source.

Carter subsequently was brought to trial on charges of the first degree murder, first degree kidnaping, and attempted second degree rape of Lewis. This trial, at which Carter generally denied guilt, resulted in a hung jury as to the murder and attempted rape charges, with 11 jurors voting to convict and one juror voting to acquit.[4]

The case was calendared for retrial approximately five months later. Immediately prior to the commencement of voir dire, Carter informed the trial court that he desired new counsel and that if new attorneys would not be appointed for him, he would represent himself. After a lengthy colloquy during which the court attempted to discern the reasons for Carter's dissatisfaction with appointed counsel and to ensure that Carter wished to proceed without the assistance of his attorneys, the court allowed Carter to represent himself with appointed counsel standing by. Carter's only witness during the guilt phase was an expert in DNA analysis who "testified that the materials she received were insufficient to develop or obtain any DNA profiles." Id. at 163. Carter was convicted of both charges, after which he accepted the assistance of counsel for the sentencing phase of the trial.

Carter's case in mitigation consisted of the testimony of a psychologist, Dr. Robert Borgman, and Carter's mother, Shirley Hill. Dr. Borgman testified that Carter had been intoxicated by drugs and alcohol on the night of the murder, and that his intoxication resulted in "psychotic symptoms." J.A. 506. On cross-examination, the State questioned Dr. Borgman about a statement in his report that Carter's intoxication was so severe that he could not engage in vaginal inter-

_____

[4] The trial court directed a verdict in favor of Carter on the kidnaping charge.

4

course, pointing out that Carter had pled guilty to raping Davis on the night of the murder. In response, Dr. Borgman stated that he would modify his opinion and conclude that Carter was not capable of performing intercourse twice on that evening.

Hill testified that she and her husband adopted Carter when he was nine months old and that she separated from Carter's father in 1971, when Carter was four. Carter continued to have a positive relationship with his father until age nine or ten, but the relationship began to deteriorate after Carter's father remarried and had additional children. Hill believed that the relationship deteriorated because Carter resented his half-siblings. Hill acknowledged that at some point during his youth, Carter had been classified as a "Willie M" child, a classification that Dr. Borgman described as applying to individuals who engage in "extremely violent behavior both towards persons and property as a result of a neurological impairment or a severe emotional disturbance." J.A. 507. In Hill's opinion, Carter's behavioral problems were caused primarily by his drug and alcohol abuse, and when not using these substances, Carter was a kind and giving person. She also testified that since being incarcerated Carter had obtained his GED and was enrolled in college. On cross-examination, however, Hill conceded that Carter had promised repeatedly to change his ways but always returned to his negative behavior patterns.

In rebuttal, the State presented evidence that Carter previously had pled guilty to felonious larceny and possession of marijuana. The State also presented evidence that Carter had beaten a former girlfriend on at least two occasions and had spit on his current girlfriend (who was the mother of his two children) during his arrest. Finally, the State offered evidence that while incarcerated Carter had disobeyed an order of a guard to enter a room and had refused to enter the room until after some haggling.

The jury recommended that Carter be sentenced to death. In reaching its decision, the jury found three aggravating factors: that the murder had been committed during the course of an attempted rape; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed during the course of conduct involving other violent crimes. The jury found one nonstatutory mitigating factor-- that Carter had admitted to prior criminal offenses--and rejected 15

5

other statutory and nonstatutory mitigators. In accordance with the recommendation of the jury, the trial court imposed a death sentence on Carter.

Carter appealed his conviction and sentence to the North Carolina Supreme Court, which affirmed. See Carter, 451 S.E.2d at 180. The United States Supreme Court subsequently denied certiorari. See Carter v. North Carolina, 515 U.S. 1107 (1995). Carter thereafter filed a motion for appropriate relief (MAR) in the Wayne County Superior Court. The state habeas court denied relief without a hearing and adopted a proposed order submitted by the State which held that all of Carter's claims were either defaulted, barred, or without merit. The Supreme Court of North Carolina denied certiorari. See State v. Carter, 510 S.E.2d 658 (N.C. 1998).

In July 1998, Carter filed this action in the district court, asserting numerous claims and requesting an evidentiary hearing. The district court denied relief without holding a hearing and denied Carter's subsequent motion to alter or amend the judgment.

II.

We first address Carter's assertion that the state habeas court did not "adjudicate" his claims within the meaning of 28 U.S.C.A. § 2254(d), as amended by the AEDPA, because that court gave only cursory consideration to the MAR. Although the action of the state habeas court concerns us, we reject Carter's contention that the amount of time a state court spends reviewing a state habeas petition is relevant to our determination of whether the state court adjudicated the claims raised therein.

Carter filed his MAR on January 31, 1997, and the State responded and moved to deny relief on the pleadings on August 19. The State's response included a proposed order. The MAR and the State's response and motion were presented to the state habeas court on October 13, in open court. In presenting the pleadings, Carter's habeas counsel explained that they had "never done one of these before" and that "basically, what we're here to do today is just introduce ourselves, and maybe get some guidance from the Court of what

6

we could expect." J.A. 542. Counsel also pointed out that Carter had requested an evidentiary hearing.

The habeas court took the papers from the parties and reviewed them from the bench without adjourning the proceedings. After perusing the pleadings for approximately one hour, the court announced that it had read the materials "in detail" and had decided to deny the MAR.**5** Id. at 543. Carter's counsel, clearly shocked, argued that the MAR should not be denied without an evidentiary hearing. The court denied this request and subsequently signed the State's proposed order without making any changes.

28 U.S.C.A. § 2254(d)(1) prohibits the federal courts from granting habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See Green v. French, 143 F.3d 865, 868-76 (4th Cir. 1998) (explaining application of § 2254(d)(1)), cert. denied, 119 S. Ct. 844 (1999).**6** Application of this standard requires a thoroughgoing review of the law applicable to each claim in order to determine whether the decision of the state court was contrary to, or an unreasonable application of, that law. See, e.g., Sexton v. French, 163 F.3d 874, 880-89 (4th Cir. 1998), cert. denied, 120 S. Ct. 139 (1999). Carter contends that § 2254(d)(1) should not apply to this case because the brief review by the state habeas court of Carter's MAR and the State's response was too perfunctory to amount to an "adjudication" within the meaning of the AEDPA.

_____

**5** Carter's MAR was 63 pages long and was accompanied by 142 pages of attachments, while the State's response was 43 pages long and was accompanied by 56 pages of attachments, including the proposed order.

**6** The Supreme Court recently heard argument in a case involving the proper interpretation of § 2254(d)(1). See Williams v. Taylor, No. 98-8384, 1999 WL 813784 (U.S. Oct. 4, 1999) (transcript of argument). Although we apply § 2254(d)(1) as interpreted by Green in deciding this case, we note that we would reach the same result even if we were to apply de novo review to Carter's legal claims.

7

Whether the decision of a state court can be considered an "adjudication" if the court did not spend an adequate amount of time reviewing the petitioner's claims is an issue of first impression. This court has, however, addressed the somewhat similar claim that a perfunctory decision that does not provide the reasoning for a denial of habeas relief is not an "adjudication" under § 2254(d)(1), and has held that such decisions do constitute "adjudications" within the meaning of § 2254(d). See Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir.), cert. denied, 119 S. Ct. 587 (1998); Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir. 1998). Cardwell is particularly instructive. In that case, we concluded that the state court "unquestionably" adjudicated the petitioner's claims even though its order neither set forth factual findings nor offered the reasoning behind its decision. Cardwell, 152 F.3d at 339. This was so, we held, because "after briefing by both parties, the Supreme Court of Virginia finally determined that [the petitioner] was not entitled to relief." Id. We indicated that this action by the court satisfied the definition of "adjudication" in Black's Law Dictionary, namely, "`[t]he formal giving or pronouncing a judgment or decree in a court proceeding.'" Id. (quoting Black's Law Dictionary 42 (6th ed. 1990)) (alteration in original).

Cardwell compels a conclusion that the action of the state habeas court on Carter's MAR constituted an adjudication. The parties fully briefed the issues and the habeas court rendered a final determination that Carter was not entitled to relief. Indeed, the court adopted the State's proposed opinion, which set forth findings of fact and articulated the legal basis for the rulings on each of Carter's claims. Accordingly, the ruling of the state habeas court is an "adjudication" within the meaning of § 2254(d)(1).

We note, however, that we are deeply troubled by the apparently cursory review given Carter's claims by the state habeas court. The parties submitted a total of 106 pages of briefing and 198 pages of attachments to the court. Carter presented ten claims and subclaims in his MAR, including four claims of constitutionally deficient representation that were properly presented for the first time on habeas review. See State v. Harris, 449 S.E.2d 371, 377 (N.C. 1994). It strains common sense to accept the proposition that an hour was a

8

sufficient amount of time to review these materials thoroughly and reach an independent, reasoned decision.[7]

In expressing our concern regarding the conduct of the state habeas proceedings in this case, we are quite aware that the state habeas court could have taken the MAR under advisement and issued a decision weeks later, after the same hour-long review, and we would be none the wiser. We simply take this opportunity to express our hope, as a federal court with limited powers of review, that state courts will give habeas petitions, particularly those in capital cases, careful and searching consideration.

III.

Turning to Carter's substantive claims, we begin with Carter's contentions regarding his efforts to obtain the appointment of new counsel prior to his second trial and his decision, in lieu of the appointment

_____

[7] Indeed, it is clear that the state habeas court was not completely familiar with the parties' pleadings, as demonstrated by a colloquy that took place following the ruling of the court:

> MR. EDWARDS [counsel for Carter]: May I make an inquiry of the Court? Does the Court have the Attorney General's proposed order?
>
> THE COURT: I do not. Do you have one, Ms. Spalding?
>
> MS. SPALDING [counsel for the State]: I have actually got one, I filed one with the answer, Your Honor, it may be in there.
>
> THE COURT: I think I overlooked it in this volume of material.
>
> MR. EDWARDS: I just wanted to know for the record, if that was filed with her response, because I know she served me a copy of the proposed order. I'd like to know if that's in the file.
>
> MS. SPALDING: It should be, Your Honor.
>
> THE COURT: If you'll give me one second.
>
> MS. SPALDING: I can give you another one.
>
> THE COURT: Yes, I do have that.

J.A. 550-51 (emphasis added).

9

of new counsel, to represent himself. Carter argues that the trial court erred in failing to appoint new counsel prior to the second trial and that the trial court did not inquire adequately into whether Carter's decision to proceed pro se was knowing and voluntary.

A.

Carter first maintains that because counsel were constitutionally ineffective in preparing for the first and second trials, the trial court should have granted his request for the appointment of new counsel prior to the second trial. Specifically, Carter complains that prior to the first trial counsel failed to hire an investigator and to obtain an expert to review the physical evidence, and that prior to the second trial counsel failed to engage in additional preparation and to consult with Carter regarding the case.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees a defendant "the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; see Gideon v. Wainwright, 372 U.S. 335, 339-45 (1963). This guarantee includes the right of an indigent defendant to have counsel appointed to assist in his defense. See McCoy v. Court of App., 486 U.S. 429, 435 (1988). An indigent defendant, however, "has no right to have a particular lawyer represent him and can demand a different appointed lawyer only with good cause." United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988). Assuming that lack of preparation amounting to constitutionally ineffective assistance can constitute cause for the appointment of new counsel, Carter cannot demonstrate that counsel's preparation was constitutionally deficient.

In order to establish that trial counsel were constitutionally ineffective, Carter must demonstrate at a minimum that his attorneys' performance during preparation for trial "fell below an objective standard of reasonableness." Strickland v. Washington , 466 U.S. 668, 688 (1984). Review of counsel's performance is "highly deferential." Id. at 689. And, competency is measured against what an objectively reasonable attorney would have done under the circumstances. See id. at 687-88. Counsel is afforded a strong presumption that his performance was within the extremely wide range of professionally competent assistance. See id. at 689.

10

Counsel of course is required to conduct a reasonable investigation, including possible defenses. See Kimmelman v. Morrison, 477 U.S. 365, 384 (1986). However, the amount of preparation necessary is a matter of professional judgment deserving of deference. See United States v. Shetterly, 971 F.2d 67, 74 (7th Cir. 1992). In preparing for the trial, Carter's attorneys interviewed all of the available witnesses as well as potential witnesses identified by Carter and his mother. Counsel also interviewed Carter. Both attorneys for Carter were familiar with the area in which the crime took place, as they lived and worked in the vicinity. It thus was not objectively unreasonable for counsel to fail to hire an investigator. See United States v. Weaver, 882 F.2d 1128, 1138 (7th Cir. 1989) (indicating that effective preparation requires the retention of an investigator when counsel is unable to personally interview witnesses and investigate defenses). Additionally, the evidence linking Carter to the crime was not complex or difficult to understand; accordingly, it was not unreasonable for counsel not to retain an expert to analyze the evidence. We therefore reject Carter's claim that counsel's preparation for the first trial was constitutionally inadequate.

Carter's assertion that counsel failed to prepare adequately for the second trial must also fail. To begin, there was no substantive change in the evidence between the first and second trials. Thus, counsel's preparation for the first trial, which we have already determined met constitutional standards, sufficed for the second trial as well. And, counsel's failure to communicate with Carter between trials was not objectively unreasonable. Counsel informed Carter of the trial date and notified him of plea offers from the State. In view of the fact that nothing in the case changed between trials, nothing more was constitutionally required.

Because Carter was not deprived of the assistance of counsel guaranteed by the Constitution, he has not established the good cause necessary to warrant the appointment of new counsel. The decision of the state habeas court rejecting this claim therefore was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

11

B.

Carter next maintains that the trial court failed to inquire adequately into whether his decision to waive counsel was knowing and voluntary. We conclude that the decision of the North Carolina Supreme Court rejecting this claim was neither contrary to, nor an unreasonable application of, clearly established federal law as established by the Supreme Court.[8]

It is well established that implicit in the Sixth Amendment right to the assistance of counsel is the right to forego such assistance and to represent oneself. See Faretta v. California, 422 U.S. 806, 814 (1975); see also id. at 833 ("[I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want."). In order for a waiver of counsel to be valid, however, it must be knowing, intelligent, and voluntary, and the defendant "should be made aware of the dangers and disadvantages of self-representation." Id. at 835; see Patterson v. Illinois, 487 U.S. 285, 292-93 (1988) (explaining that "the key inquiry" in determining whether a waiver of the Sixth Amendment right to counsel was knowing, intelligent, and voluntary "must be: Was the accused ... made sufficiently aware of his right to have counsel ... and of the possible consequences of a decision to forgo the aid of counsel?"). Although no "precise procedure or litany for this evaluation" is required, the court must consider the record as a whole--including "the defendant's background capabilities and understanding of the dangers and disadvantages of self-representation"--in determining whether the waiver is knowing, intelligent, and voluntary. United States v. Singleton, 107 F.3d 1091, 1097-98 (4th Cir. 1997); see Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("The determination of whether

_____

[8] In ruling on Carter's claim, the North Carolina Supreme Court cited only North Carolina cases and statutes. However, the North Carolina Supreme Court determined that the waiver was knowing and voluntary and relied on North Carolina cases that, in turn, cited relevant authority from the United States Supreme Court. See, e.g. , State v. Thomas, 417 S.E.2d 473, 476 (N.C. 1992) (citing Faretta v. California, 422 U.S. 806 (1975)). The court thus adjudicated Carter's Sixth Amendment claim, warranting review under § 2254(d)(1). See Green, 143 F.3d at 885 n.4.

12

there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

Here, the trial court engaged Carter in a lengthy colloquy concerning his dissatisfaction with appointed counsel and his desire to represent himself prior to allowing him to proceed pro se.[9] The content of

_____

[9] In pertinent part, the colloquy was as follows:

> MR. CARTER: ... I had some problems with these lawyers before my other trial, right, but yet I went on ahead and went forward with letting them represent me but I dont want them on my case. I want two more lawyers today. I don't want these two.
>
> ....
>
> THE COURT: Well, let me ask you this, Mr. Carter. They ... participated in the trial of this case before when ... there was a mistrial; is that correct?
>
> MR. CARTER: Yes, sir.
>
> ....
>
> THE COURT: And of course ... Mr. Jordan and Mr. Braswell both cross-examined the witnesses and participated in that whole trial.
>
> MR. CARTER: Hey, they did that but what I am saying, this time I do not want them....
>
> THE COURT: Is there anything about the case that they don't know that would!
>
> MR. CARTER: No, it is not about the case. See I had time to go back myself and listen to the case, you know, when you got your time off to yourself and what they have done the last time, yes, I was a lucky man because ... the way they represented me, I could have did that myself.
>
> THE COURT: Well.
>
> MR. CARTER: A bunch of motions but as far as really cross-examining, nary one of them did that. So I don't want these lawyers period. If you can't ... accept that, Your Honor, I will sit here. Let y'all go ahead with whatever you want to do but I prefer you to just call two more lawyers off the calendar....

13

this conversation reveals that Carter understood the functions of counsel during the trial and recognized that he would have to perform those functions himself. Additionally, Carter was plainly aware that he faced a potential sentence of death if convicted. Moreover, the history of the case makes clear that Carter understood the nature of the charges against him and the judicial process: He was present during his first trial where the charges were prosecuted by the State and defended by his attorneys. See Singleton, 107 F.3d at 1098 (concluding that record showed defendant was aware of the nature of the charges against him and the judicial process because he had been

_____

THE COURT: Well, ... I can't under the law do that, Mr. Carter.

....

MR. CARTER: ... [T]o get them off, how would I have to do that then because I am not going to stand trial with these two lawyers?

THE COURT: Well, ... you have a right to proceed and represent yourself if you want to do that. I would not advise you to do that but I mean if you want to discharge them completely and proceed without a lawyer, I mean you are at liberty to do that....

MR. CARTER: Send them home then. If I got to do any time, if I got to get any kind of death penalty, I got to do it so send them home. I don't want them.

THE COURT: Mr. Carter, I don't believe you want to do that.

MR. CARTER: I do. Believe me, I do.

THE COURT: Well, I can appoint them as standby counsel and I am going to do that if I allow you to discharge them.

....

THE COURT: ... You sure you want to do this, Mr. Carter?

MR. CARTER: Yes, sir.

THE COURT: I can't talk you out of it?

MR. CARTER: No, sir.

J.A. 256-64.

14

arraigned twice and had been present during the first day of his trial, and thus observed attorneys arguing motions, examining witnesses, and making objections). With respect to Carter's intelligence and capability, the trial court had ample opportunity to observe him during the colloquy preceding his decision to represent himself. Carter's comments during this colloquy indicated a mind capable of grasping the issues related to self-representation. See id. at 1098-99. In light of all of these circumstances, we hold that the determination of the North Carolina Supreme Court that the trial court inquired adequately into Carter's decision to represent himself was neither contrary to, nor an unreasonable application of, clearly established federal law as established by the Supreme Court.

IV.

During the penalty phase, the trial court instructed the jury regarding the process of weighing aggravating factors against mitigating circumstances:

> Issue Three reads as follows, do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstances or circumstance found by you. If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. <u>In deciding this issue, each juror</u> **may consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence in Issue Two**. In so doing, you are the sole judges of the weight to be given to any individual ... circumstances which you find, whether aggravating or mitigating.

Tr. 1596 (emphases added). Carter maintains that the emphasized sentence, particularly the use of the word "may," permitted the jurors to ignore the mitigating circumstance that they had found in violation of the Eighth Amendment. See Eddings v. Oklahoma , 455 U.S. 104, 114-15 (1982) (explaining that while "[t]he sentencer ... may determine the weight to be given relevant mitigating evidence," it may not give such evidence "no weight" by excluding it from consideration).

15

We conclude that the challenged instruction did not violate Carter's constitutional rights. In determining whether a jury instruction violates the Eighth Amendment, a reviewing court must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). Although the defendant need not establish that it was more likely than not that the jury interpreted the instruction erroneously, a mere possibility of an incorrect understanding is not sufficient to establish an Eighth Amendment violation. See id. Moreover, the court must not "engage in a technical parsing" of the instruction, but rather must evaluate it "with a commonsense understanding of the instructions in the light of all that has taken place at the trial." Johnson v. Texas, 509 U.S. 350, 368 (1993) (internal quotation marks omitted). Here, there is no reasonable likelihood that the jury misinterpreted the challenged instruction. Indeed, the instruction made clear not only that the jury was required to weigh the mitigating evidence against the aggravating circumstances, but also that each juror was to conduct that weighing based on the mitigating circumstances found by that particular juror. That the trial court used the word "may" instead of the word "must"--as Carter would have preferred-- does not create a reasonable likelihood that the jury misunderstood its task. Accordingly, we conclude that the rejection of this claim by the North Carolina Supreme Court was neither contrary to, nor an unreasonable application of, clearly established federal law as established by the Supreme Court.

V.

Carter also maintains that his attorneys, whose assistance he accepted after the jury convicted him during the guilt phase, were constitutionally ineffective during the sentencing phase. Specifically, Carter complains that counsel failed to inform Dr. Borgman, before he drafted his report, that Carter had raped Davis on the night of the murder and failed to advise Hill not to testify that Carter was a good and kind person when not on drugs. According to Carter, these failures devastated his chances of persuading the jury to impose a life sentence. Carter notes that the State undermined Dr. Borgman's testimony by confronting him with his obviously erroneous conclusion that Carter was incapable of vaginal intercourse on the night of the

16

murder. And, Carter maintains that Hill's testimony opened the door for the State to introduce evidence that Carter had committed other crimes and had abused his former girlfriend and his current girlfriend, the mother of his children. As noted above, the success of Carter's claim that counsel were constitutionally deficient depends upon his ability to establish that counsel's performance fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 688. This alone is not sufficient, however; Carter must also demonstrate that he was prejudiced by counsel's deficient performance, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

We conclude that Carter was not deprived of the effective assistance of counsel at sentencing. Counsel's strategy during the penalty phase was to link Carter's violent behavior as an adult to his troubled upbringing. In pursuit of that strategy, counsel retained Dr. Borgman and provided him with Carter's medical and juvenile records and a copy of the charges. Also, Dr. Borgman interviewed Carter at some length, discussing, inter alia, the events of the night of the murder. It was not objectively unreasonable for counsel to believe that Carter would provide Dr. Borgman with a full account of his actions on that evening.

Additionally, testimony regarding Carter's drug and alcohol abuse was critical to at least two of the mitigating circumstances offered to the jury--that Carter committed the offense while under the influence of a mental or emotional impairment and that Carter's ability to appreciate the criminality of his conduct or conform his conduct to the dictates of the law was impaired. Hill's testimony that Carter was a kind and giving person when not on drugs provided evidence of a connection between Carter's drug use and his violent behavior, and thus was important to his defense. We therefore conclude that allowing Hill to so testify did not constitute objectively unreasonable performance.[10] Accordingly, the rejection of this claim by the state habeas court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

_____

[10] In light of this conclusion, we need not consider whether Carter suffered prejudice. See Joseph v. Angelone, 184 F.3d 320, 326 (4th Cir.), cert. denied, 120 S. Ct. 392 (1999).

17

VI.

Finally, Carter raises several claims of prosecutorial misconduct and a challenge to instructions and comments by the trial court, all of which arise from the conduct of voir dire. These claims may be summarized as follows:

1) During voir dire, the prosecutor explained to prospective jurors that Carter possessed a Fifth Amendment right not to testify and that they could not hold the exercise of this right against him. Although Carter does not assert that the prosecutor stated the law incorrectly, he nevertheless maintains that these comments violated Griffin v. California, 380 U.S. 609, 615 (1965) (holding that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt").

2) During voir dire, the prosecutor inquired of prospective jurors whether they believed that the use of drugs or alcohol should provide an excuse for criminal behavior. Carter argues that these questions were intended to predispose jurors to reject intoxication as a mitigating factor, in violation of the Sixth, Eighth, and Fourteenth Amendments.

3) After a prospective juror expressed reluctance to impose the death penalty in view of Carter's decision to represent himself, the prosecutor asked several questions that suggested the possibility that Carter's decision to represent himself was a ploy to gain sympathy. Carter argues that the prosecutor's comments denigrated his Sixth Amendment right to self-representation as articulated in Faretta.

4) Carter maintains that several comments by the trial court violated the Eighth Amendment by diminishing the jurors' sense of responsibility for imposing the death penalty. See Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

18

The district court concluded that Carter had defaulted all of these claims by failing to raise them on direct appeal, and we determine that this ruling must be affirmed.

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

Carter acknowledges that he defaulted these claims by failing to raise them on direct appeal. See N.C. Gen. Stat. § 15A-1419(a)(3) (1997); Boyd v. French, 147 F.3d 319, 332 (4th Cir. 1998) (explaining that "[t]his court has consistently held ... that § 15A-1419 is an adequate and independent state-law ground for decision foreclosing federal habeas review"), cert. denied, 119 S. Ct. 1050 (1999). He maintains, however, that he has established cause to excuse the default because appellate counsel were constitutionally ineffective for failing to raise the claims. See Evitts v. Lucey , 469 U.S. 387, 396-97 (1985) (holding that a defendant has a Sixth Amendment right to the effective assistance of counsel on direct appeal). Further, Carter contends that he suffered prejudice because the claims are meritorious and would have resulted in reversal of his conviction.[11]

If attorney error amounts to constitutionally ineffective assistance of counsel under the standard established in Strickland--i.e., if counsel's performance was objectively unreasonable and there is a reasonable probability that absent the deficient performance, the result of the proceeding would have been different--the Sixth Amendment dictates that the attorney's error be imputed to the state. See Coleman v. Thompson, 501 U.S. 722, 754 (1991). Consequently, when attorney error amounts to constitutionally ineffective assistance of counsel, it

_____

[11] Carter does not maintain that his default should be excused on the basis of a fundamental miscarriage of justice, i.e., that he was actually innocent of the murder of Lewis. See Murray v. Carrier, 477 U.S. 478, 495-96 (1986).

19

provides the cause necessary to excuse a procedural default.**12** See id. at 752-54; Murray v. Carrier, 477 U.S. 478, 488 (1986).

Appellate counsel's performance is entitled to a strong measure of deference from a reviewing court. Counsel is not required to raise every colorable claim on appeal; rather, "[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail ... is the hallmark of effective appellate advocacy." Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989) (internal quotation marks omitted); see Jones v. Barnes, 463 U.S. 745, 751-53 (1983). At a minimum, appellate counsel cannot be found ineffective for failing to raise issues as to which there is no reasonable likelihood of success.

We conclude that Carter's appellate counsel did not act in an objectively unreasonable fashion in failing to raise Claims One through Four on direct appeal. Our rationale for this determination with respect to Claim Three differs from our rationale with respect to the other claims; we therefore will begin by addressing that issue separately.

A.

Appellate counsel were not ineffective for failing to raise Claim Three on appeal because it is plainly without merit. As explained above, in Claim Three Carter challenges several voir dire questions by the prosecutor that suggested that Carter might have elected to represent himself in order to gain sympathy from the jury. A prosecutor's comments may violate a defendant's constitutional rights either by infringing on a specific constitutional guarantee or by rendering the entire trial so fundamentally unfair as to violate due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Rogers v. Lynaugh, 848 F.2d 606, 608-09 (5th Cir. 1988). If the defendant alleges the violation of a specific constitutional right, the court must

_____

**12** It is an open question whether a showing of prejudice sufficient to satisfy the second prong of the Strickland analysis also meets the "prejudice" component of the cause and prejudice analysis. See Williams v. French, 146 F.3d 203, 210 n.10 (4th Cir. 1998), cert. denied, 119 S. Ct. 1061 (1999). We need not decide that issue here because Carter can satisfy neither standard.

decide whether the prosecutor's comments violated the right and if so, whether the error was harmless. See Rogers, 848 F.2d at 609. In considering a general claim of a violation of due process, a court must first determine whether the prosecutor's remarks were improper. See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993). If so, the court must then decide whether the improper remarks"prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." Id. (internal quotation marks omitted). In deciding whether improper prosecutorial comments prejudiced the defendant, the court should consider several factors, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Id. at 241 (internal quotation marks omitted).

Carter points to no authority, and we have found none, for the proposition that comments such as those by the prosecutor in this case amount to an effective denial of the right to self-representation. Moreover, while we have little doubt that the prosecutor would have violated this right had he argued that Carter's decision to represent himself constituted evidence of guilt, cf. United States ex rel. Macon v. Yeager, 476 F.2d 613, 615-16 (3d Cir. 1973) (holding that argument encouraging jury to infer guilt from defendant's consultation with an attorney shortly after the crime but prior to arrest violated the defendant's Sixth Amendment right to counsel), the prosecutor's questions simply did not cross this threshold. We therefore conclude that the questions asked by the prosecutor did not violate Carter's Sixth Amendment right to self-representation.

We further determine that, assuming the comments were improper, they did not so infect the entire trial with unfairness as to violate due process. To begin, the potential for prejudice from the comments was not substantial. The remarks were isolated, comprising only three and one-half pages of a 508-page voir dire transcript. Additionally, there

21

is no indication that the prosecutor made the comments in a deliberate attempt to distract the jury from the issue of Carter's guilt and the appropriate punishment. Indeed, the prosecutor's questions had little or no tendency to mislead the jurors as to issues of guilt or innocence. Finally, we note that the trial court explained to the venire on several occasions that Carter had elected to represent himself, that it was his right to do so, and that two attorneys had been appointed to assist Carter. In view of all of these circumstances, we conclude that the prosecutor's remarks did not so infect the trial with unfairness as to violate due process; accordingly, counsel were not objectively unreasonable for failing to raise this claim on appeal.

B.

We next turn to Carter's allegation that appellate counsel were constitutionally ineffective for failing to raise Claims One, Two, and Four on direct appeal. Because Carter failed to object to these claimed errors during trial, they were waived absent a showing of plain error.[13] See State v. Oliver, 307 S.E.2d 304, 311-12 (N.C. 1983). The North Carolina Supreme Court has explained that plain error review is strictly limited to

> the exceptional case where, after reviewing the entire record, it can be said the claimed error is a <u>fundamental</u> error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the ... mistake had a probable impact on the jury's finding that the defendant was guilty.

_____

[13] North Carolina law also allows review of certain allegations of error that are deemed preserved "by rule or law." N.C. R. App. P. 10(b)(1). Carter does not contend that Claims One, Two, and Four are errors of the type that are preserved without objection under Rule 10(b)(1).

22

Id. at 312 (internal quotation marks omitted) (first alteration in original). In order to establish a plain error, the defendant must show "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." State v. Bishop, 488 S.E.2d 769, 779 (N.C. 1997). We conclude that the errors claimed by Carter do not satisfy these standards, and therefore determine that counsel were not ineffective for failing to raise these issues on appeal.

1.

In Claim One, Carter challenges the prosecutor's repeated references during voir dire to Carter's Fifth Amendment right not to testify.**14** Carter does not assert, nor could he do so meritoriously, that the prosecutor mischaracterized the nature of Carter's Fifth Amendment rights or encouraged the members of the venire to infer guilt from Carter's silence in the event he did not testify. Instead, Carter relies on a Florida case, Varona v. State, 674 So. 2d 823 (Fla. Dist. Ct. App. 1996), for the proposition that any comment by the prosecutor regarding the defendant's Fifth Amendment right not to testify is error. We disagree.

The Supreme Court has noted that "[i]t is clear from even a cursory review of the facts and the square holding of the Griffin case that the Court was there concerned only with adverse comment, whether by the prosecutor or the trial judge." Lakeside v. Oregon, 435 U.S. 333, 338 (1978). Thus, the relevant inquiry in assessing a claim of a Griffin violation is "whether the ... remarks embody the evil to which Griffin addressed itself: the invitation to infer guilt from a defendant's decision not to take the stand." United States v. Wing, 104 F.3d 986, 990 (7th Cir. 1997). We conclude that the prosecutor's questions during

_____

**14** The following statement is typical of those to which Carter objects:

> He doesn't have to put on any evidence. Doesn't have to testify, doesn't have to do anything but sit here and be a party to the proceedings. And if he decides not to put on any evidence, ... if he decides not to testify, you cannot use that against him in arriving at your verdicts; do you understand that?

Tr. 209.

23

voir dire, which simply explained to prospective jurors the nature and import of the Fifth Amendment right not to testify, offered no such invitation. Moreover, the fact that the prosecutor's correct explanation of Carter's Fifth Amendment right may have drawn attention to Carter's ultimate decision not to testify does not violate the Constitution. Cf. Lakeside, 435 U.S. at 339-41 (holding that trial court did not violate Griffin by instructing jury regarding right not to testify over defendant's objection, even though the instruction may have called unwanted attention to defendant's failure to testify). Therefore, because the prosecutor's comments did not constitute error, much less plain error, Carter's appellate counsel were not ineffective for failing to raise Claim One on appeal.

2.

Claim Two concerns questions by the prosecutor during voir dire regarding whether the prospective jurors believed that the use of drugs or alcohol should provide an excuse for criminal behavior. Carter alleges that these questions were intended to predispose the jurors toward rejecting intoxication as a mitigating factor during the sentencing phase.

We conclude that the challenged questions did not violate Carter's constitutional rights; therefore, it was not objectively unreasonable for Carter's appellate counsel to fail to raise this claim on direct appeal. Carter simply cites no authority from the Supreme Court or any other federal tribunal, and we are aware of none, for the proposition that voir dire questions such as those posed by the prosecutor are improper.[15]

_____

[15] Carter does cite Wainwright v. Witt, 469 U.S. 412, 423 (1985), for the general proposition that voir dire is a "quest ... for jurors who will conscientiously apply the law and find the facts." However, Wainwright --which concerned the proper standard for challenging prospective jurors for cause based on opposition to the death penalty--provides no authority for the proposition that the prosecutor's questions were improper.

Additionally, the questions asked by the prosecutor are proper under North Carolina law. See State v. McKoy, 372 S.E.2d 12, 18-19 (N.C. 1988), vacated and remanded on other grounds , 494 U.S. 433 (1990). Therefore, to the extent Carter argues that appellate counsel were ineffective for failing to raise the claim as a matter of state law, the contention is without merit.

24

3.

Lastly, Carter maintains that comments by the trial court explaining the respective duties of the court and the jury diminished the jurors' sense of responsibility for imposing the death penalty, in violation of the Eighth Amendment principles set forth in <u>Caldwell</u>. Carter maintains that the trial court violated <u>Caldwell</u> in two ways. First, in explaining to a prospective juror the process of polling the jury on its verdict, the court stated that "[i]t would be up to the Judge to actually impose ... a death sentence."**16** Tr. 152. Second, throughout voir dire the court informed prospective jurors that the role of the jury was to "recommend" a sentence which would then be imposed by the court.**17**

Carter's assertion that the challenged comments violated the Eighth Amendment is clearly without merit. The statement of the trial court that it would impose the sentence and its repeated observations that the role of the jury was to recommend a sentence are both correct statements of North Carolina law, <u>see</u> N.C. Gen. Stat. § 15A-2000(b) (1997) (providing that "the jury shall ... render a sentence recommendation to the court"); N.C. Gen. Stat. § 15A-2002 (1997) (requiring the trial court to impose a sentence consistent with the recommendation of the jury), and therefore could not constitute a violation of the Eighth Amendment under <u>Caldwell</u>. <u>See Dugger v. Adams</u>, 489 U.S.

_____

**16** In context, the statement of the court was as follows:

> [After the Foreman announces the verdict,] each juror would be asked, you have heard your Foreman say for your verdict so and so and so. Was this your verdict? Do you still assent to that verdict? That would be the procedure involved. It would be up to the Judge to actually impose ... a death sentence.

Tr. 152.

**17** Carter also challenges a statement made by the court while instructing members of the venire concerning the procedure in a capital case. During those instructions, the court stated, "If the Court finds the defendant guilty of first degree murder, the law of the State requires that the jury then separately consider evidence of aggravating and mitigating circumstances ...[.]" Tr. 203. We think it is patently clear from the record, however, that the misstatement of which Carter complains--that "the Court" would make the determination of guilt--was a mere slip of the tongue that violated neither <u>Caldwell</u> nor Carter's due process rights.

25

401, 407 (1989) ("[I]f the challenged instructions accurately described the role of the jury under state law, there is no basis for a <u>Caldwell</u> claim."); <u>Gaskins v. McKellar</u>, 916 F.2d 941, 953 (4th Cir. 1990). Appellate counsel therefore did not act unreasonably in failing to raise this claim on appeal.

VII.

For the reasons set forth above, we conclude that Carter has failed to make a substantial showing of the denial of a constitutional right with respect to each of his assertions of error. **18** Accordingly, we deny his request for a certificate of appealability and dismiss the appeal.

<u>DISMISSED</u>

_____

**18** We also conclude that Carter is not entitled to an evidentiary hearing on any of his claims.