Kevin Dewayne **CARDWELL,**
Petitioner–Appellant,

v.

Fred W. **GREENE,** Warden, Mecklenburg Correctional Center, Respondent–Appellee.

No. 97–20.

United States Court of Appeals, Fourth Circuit.

Argued April 8, 1998.

Decided Aug. 11, 1998.

**ARGUED:** Dennis William Dohnal, Brenner, Dohnal, Evans & Yoffy, Richmond, Virginia, for Appellant. Robert Quentin Harris, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** Mark L. Earley, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WIDENER, MURNAGHAN, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WIDENER and Judge MICHAEL joined.

## OPINION

MURNAGHAN, Circuit Judge:

Kevin DeWayne Cardwell appeals the district court's dismissal of his petition for a writ of habeas corpus. The appeal presents three questions. First, we are called upon to determine whether the district court erred in denying Cardwell an evidentiary hearing on his claim of ineffective assistance of counsel. Because we find that Cardwell has failed to demonstrate entitlement to an evidentiary hearing, we consider whether his death sentence was rendered constitutionally infirm by trial counsel's failure to develop and present expert testimony regarding Cardwell's mental health. In assessing the merits of Cardwell's claim, we must also decide whether the Virginia Supreme Court's summary disposition of Cardwell's ineffective assistance claim constitutes an "adjudicat[ion] on the merits" within the meaning of 28 U.S.C. § 2254(d)(1), and, if so, how the absence of a statement of reasons affects our review of the state court decision.

### I

The facts relating to Cardwell's murder of fifteen-year-old Anthony Brown have been fully set forth by the Virginia Supreme Court in *Cardwell v. Commonwealth*, 248 Va. 501, 450 S.E.2d 146, 149–50 (1994). Because our analysis of Cardwell's ineffective assistance claim requires some understanding of those facts, we provide a brief summary here.

On November 20, 1991, Tina Poindexter alerted Cardwell to Brown's impending arrival in Richmond, Virginia. Poindexter informed Cardwell that Brown would be carrying drugs, and that she intended to meet Brown upon his arrival at the bus station. Armed with handguns, Cardwell and three friends intercepted Brown and Poindexter at the bus station. They stole Brown's duffel bag and repaired to Cardwell's apartment. A search of the duffel bag however, failed to yield any drugs.

The traitorous Poindexter then called Cardwell to advise him that the drugs were strapped to the inside of Brown's leg. At Cardwell's suggestion, Poindexter agreed to tell Brown that she had friends who could help retrieve his stolen belongings and bring him to Cardwell's apartment. When Cardwell announced to his friends that he planned to rob Brown again and then either to knock him unconscious or kill him, two of the confederates departed. It remained to Cardwell and Richard Claiborne to implement the scheme.

Shortly after Poindexter and Brown arrived, Cardwell pointed a gun at Brown and demanded the drugs. Claiborne pulled down Brown's pants and took the drugs from Brown's inner thigh. Brown was then forced at gunpoint to lie face down on the floor in the back seat of Poindexter's car. Brown repeatedly begged that his life be spared, to which Cardwell responded "shut up."

After driving to the back of a shopping center, Cardwell demanded Claiborne's .380 caliber automatic pistol and marched Brown into the woods. Claiborne, who followed at a distance of approximately ten feet, heard Brown plead for his life and Cardwell answer "shut up." Claiborne then heard a "gargling noise" which he recognized "from the movies" as the sound of Cardwell cutting Brown's throat. Noticing Claiborne's presence, Cardwell said "I'm going to shoot him and he's going to die." Claiborne said "No" and turned to walk back to the car. Two gun-

shots were fired, and Cardwell returned to Poindexter's car. The trio drove to Cardwell's apartment, where Cardwell threw Claiborne's pistol and a six-inch steak knife into a dumpster. Brown's decomposed body was discovered in the woods approximately two months later. An autopsy revealed that Brown had sustained knife injuries to the wrist and neck, and two gunshot wounds to the back of the head.

On May 10, 1993, Cardwell was indicted in the Circuit Court for Henrico County, Virginia, on three counts of capital murder. Cardwell was further charged with abduction, robbery, and three counts of using a firearm in the commission of a felony. The court appointed Robert Geary to represent Cardwell on May 20, 1993, and trial was scheduled to commence on July 19, 1993. The trial court subsequently appointed John McGarvey to act as co-counsel for the defense.

On June 24, 1993, the court granted a defense motion for a continuance and rescheduled the trial to commence on September 7, 1993. The court cautioned the parties to bring any matters that would occasion additional delay promptly to the court's attention, and strongly implied that it would be unreceptive to further requests for continuance.

On August 3, 1993, the trial court granted Cardwell's motion to appoint Dr. Randy Thomas, a mental health expert selected by the defense, to assist in the development of evidence for possible use in the penalty phase of the capital murder proceedings. Defense counsel immediately telephoned Dr. Thomas, only to discover that he was on vacation and would not return until August 25. Upon his return, Dr. Thomas advised Cardwell's attorneys that he would need approximately one and a half months to complete his evaluation of Cardwell.

Cardwell's counsel moved for a second continuance on August 23, 1993, explaining that Dr. Thomas had been unavailable and that

additional time was required to obtain an evaluation. The trial court summarily denied Cardwell's motion on August 24, and trial commenced as scheduled on September 7.

Following a two-day trial, a jury convicted Cardwell of two counts of capital murder,[1] and all other counts as charged. When the capital sentencing phase of Cardwell's trial began on September 9, 1993, Cardwell's request for a continuance was renewed. Counsel proffered a preliminary report in which Dr. Thomas opined that further investigation was warranted with respect to Cardwell's family history, the possibility of severe abuse of drugs and alcohol, and the possibility that Cardwell had suffered brain dysfunction or a learning disability as a consequence of a childhood head injury. The court received Dr. Thomas' preliminary evaluation into the record, but refused to grant a continuance of the sentencing proceedings.

In the penalty phase, the Commonwealth sought the imposition of the death penalty on the ground that Cardwell's conduct in murdering Brown had been "outrageously or wantonly vile," or, in the alternative, because there was a probability that Cardwell was likely to commit criminal acts of violence in the future. *See* Va.Code § 19.2–264.2. Cardwell called only his grandmother, Donzell Cardwell, to provide evidence in mitigation. On September 9, 1993, the jury unanimously recommended a sentence of death on the basis of vileness.

The trial court reviewed the jury's recommendation pursuant to Va.Code § 19.2–264.5, which provides:

> When the punishment of any person has been fixed at death, the court shall, before imposing sentence, direct a probation officer of the court to thoroughly investigate the history of the defendant and any and all other relevant facts, to the end that the court may be fully advised as to whether the sentence of death is appropriate and just.... After consideration of the report, and upon

---

1. The prosecution withdrew the third capital murder charge before trial. The jury convicted Cardwell of the willful, deliberate, and premeditated killing of Brown: (1) in the commission of an abduction with the intent to extort money or a pecuniary benefit, in violation of Va.Code § 18.2–31(1); and (2) in the commission of robbery while armed with a deadly weapon, in violation of Va.Code § 18.2–31(4).

good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life.

At a hearing on November 10, 1993, the trial judge inquired whether defense counsel had any additional evidence to submit in connection with sentencing. Counsel declined. McGarvey explained later that he elected for strategic reasons not to complete and submit an evaluation of Cardwell's mental health to the trial court during its final review of Cardwell's death sentence. In an affidavit submitted to the Virginia Supreme Court during state habeas proceedings, McGarvey stated:

> I made a strategic decision not to continue with the evaluation by Dr. Thomas. Based on my experience, I did not believe that the trial judge would have overturned the jury's sentencing decision on Dr. Thomas' findings. Had I continued with the evaluations, and submitted the information to the court at final sentencing, I ran the real risk that the trial court would have found that the information would not have made a difference, thereby undercutting my claim when I took the issue up on appeal.

The trial court imposed a sentence of death in accordance with the recommendation of the jury.

On direct appeal, the Virginia Supreme Court affirmed Cardwell's convictions and sentences. *Cardwell v. Commonwealth,* 248 Va. 501, 450 S.E.2d 146 (1994). The United States Supreme Court denied certiorari on May 1, 1995. *Cardwell v. Virginia,* 514 U.S. 1097, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995).

On July 7, 1995, the state trial court appointed counsel to represent Cardwell in state postconviction proceedings. Cardwell filed an "Incomplete Original Petition" in August 1995, and filed several motions for the appointment of experts to assist in the preparation of his petition. On December 15, 1995, the Supreme Court of Virginia granted Cardwell thirty days to amend the August 1995 petition, but denied his motions

for the appointment of experts. Cardwell filed an amended petition on January 23, 1996. Included among his claims for relief was an argument that he had been denied the effective assistance of counsel by virtue of his trial counsel's failure to develop and present evidence concerning Cardwell's mental health.

The Virginia Supreme Court denied Cardwell's amended petition in its entirety on May 3, 1996.[2] No evidentiary hearing was provided.[3] After concluding that one of Cardwell's claims had been procedurally defaulted, the court tersely stated: "finding no merit in other complaints raised by petitioner, the Court is of the opinion that the writ of habeas corpus should not issue as prayed for."

Cardwell again sought the assistance of experts in preparing his federal habeas petition. On February 24, 1997, the district court granted Cardwell's motion to appoint Dr. Robert Hart, a neuropsychiatrist, and Dr. Leigh Hagan, a clinical psychologist, to evaluate Cardwell's mental condition. Cardwell filed Drs. Hart's and Hagan's reports with his habeas corpus petition on March 17, 1997, and requested an evidentiary hearing. The Commonwealth opposed an evidentiary hearing, and moved to dismiss Cardwell's petition.

The district court permitted expansion of the record to include the expert reports of Drs. Hart and Hagan, but denied Cardwell an evidentiary hearing. *Cardwell v. Netherland,* 971 F.Supp. 997, 1012 (E.D.Va.1997). After a careful review of the expanded record, the district court concluded that Cardwell had failed to establish entitlement to federal habeas relief, and granted the Commonwealth's motion to dismiss the petition. *Id.* at 1022.

Cardwell appealed, and simultaneously filed an application for a certificate of appealability ("COA") with the district court. On October 7, 1997, the district court granted

---

**2.** The Virginia Supreme Court has exclusive original jurisdiction of habeas corpus petitions filed by prisoners "held under sentence of death." Va.Code § 8.01–654(c)(1).

**3.** Sections 8.01–654(c)(1) & (2) of the Virginia Code permit an evidentiary hearing in the circuit court only by order of the Virginia Supreme Court, and then only on the issues enumerated in the order of the Virginia Supreme Court.

the COA with respect to: (1) Cardwell's claim of ineffective assistance of counsel, and (2) Cardwell's request for an evidentiary hearing on his ineffective assistance claim.

## II

Cardwell's principal argument on appeal is that the district court erroneously denied him an evidentiary hearing. Because Cardwell's federal habeas petition was filed after the effective date of enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 1996 U.S.S.C.A.N. (110 Stat.) 1214, we must consider the effect of the AEDPA on the standards governing evidentiary hearings. *See Lindh v. Murphy,* — U.S. ——, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997).

Before the enactment of the AEDPA, the disposition of a federal habeas petitioner's request for an evidentiary hearing was controlled by Rule 8(a) of the Rules Governing § 2254 Cases and by the Supreme Court's decision in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as modified by *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Rule 8(a) provides that "[i]f the petition is not dismissed at a previous stage in the proceeding," the district court "shall determine whether an evidentiary hearing is required."

*Townsend* defined the circumstances in which a federal evidentiary hearing was mandatory, while emphasizing that the federal courts retained discretion in many cases to grant or deny a hearing. *Townsend,* 372 U.S. at 312–13, 83 S.Ct. 745. The Supreme Court held that a federal court was empowered to grant an evidentiary hearing "where an applicant for a writ of habeas corpus allege[d] facts which, if proved, would entitle him to relief." *Townsend,* 372 U.S. at 312, 83 S.Ct. 745; *Beaver v. Thompson,* 93 F.3d 1186, 1190 (4th Cir.), *cert. denied sub nom. Beaver v. Netherland,* — U.S. ——, 117 S.Ct. 553, 136 L.Ed.2d 424 (1996); *Poyner v. Murray,* 964 F.2d 1404, 1414 (4th Cir.1992). If it was further shown that "the habeas applicant did not receive a full and fair evidentiary hearing in a state court," *id.* at 312, 83 S.Ct. 745, the Court concluded that a federal evidentiary hearing was mandatory,

and specified six circumstances in which a hearing was required:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S.Ct. 745.

In *Keeney,* the Court considered whether an evidentiary hearing was required under *Townsend*'s fifth circumstance where the petitioner's "failure to develop the critical facts relevant to his federal claim was attributable to inexcusable neglect." *Keeney,* 504 U.S. at 4, 112 S.Ct. 1715. The Court held that an evidentiary hearing was required only if the petitioner could "show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Id.* at 11, 112 S.Ct. 1715. The Court explained: "Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits." *Id.* at 10, 112 S.Ct. 1715.

Where *Townsend* and *Keeney* together limit the discretion of a federal court to *deny* an evidentiary hearing, establishing the circumstances in which a hearing is mandatory, the AEDPA imposes an express limitation on the power of a federal court to *grant* an evidentiary hearing. *See McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir.1998) ("Consistent with the AEDPA's goal of streamlining the habeas process, § 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required."). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an

evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

   (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The petitioner who seeks an evidentiary hearing in federal court must now clear the "initial hurdle" of § 2254(e)(2), *McDonald,* 139 F.3d at 1060, before the court can proceed to determine whether an evidentiary hearing is otherwise proper or necessary. Thus, a federal court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has "failed to develop the factual basis of a claim in State court." If so, the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in § 2254(e)(2)(A) & (B). If, on the other hand, the applicant has not "failed to develop" the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under · *Townsend.*

■ It is undisputed that the factual basis of Cardwell's ineffective assistance claim was not developed in state court. No factual development occurred on direct appeal,· for ineffective assistance claims are not cognizable on direct review in Virginia. *See Roach v. Commonwealth,* 251 Va. 324, 468 S.E.2d 98, 105 n. 4 (Va.), *cert. denied,* —— U.S. ——, 117 S.Ct. 365, 136 L.Ed.2d 256 (1996); *Walker v. Mitchell,* 224 Va. 568, 299 S.E.2d 698, 699 (1983). Moreover, although Cardwell requested an evidentiary hearing on his state habeas corpus petition, the Virginia Supreme Court summarily dismissed the petition without a hearing. The question with which we are confronted, therefore, is whether Cardwell has "failed" to develop the facts supporting his claim within the meaning of § 2254(e)(2).

■ We join four of our sister circuits in holding that where an applicant has diligently sought to develop the factual basis of a claim for habeas relief, but has been denied the opportunity to do so by the state court, § 2254(e)(2) will not preclude an evidentiary hearing in federal court. *See McDonald,* 139 F.3d at 1059 (holding that "a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission"); *Burris v. Parke,* 116 F.3d 256, 258–59 (7th Cir.) ("To be attributable to a 'failure' under federal law the deficiency in the record must reflect something the petitioner did or omitted."), *cert. denied,* —— U.S. ——, 118 S.Ct. 462, 139 L.Ed.2d 395 (1997); *Jones v. Wood,* 114 F.3d 1002, 1013 (9th Cir.1997) ("Where, as here, the state courts simply fail to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on otherwise exhausted habeas claims."); *Love v. Morton,* 112 F.3d 131, 136 (3d Cir.1997) (finding § 2254(e)(2) inapplicable where "factors other than the defendant's action prevented a factual record from being developed"). Because the term " '[f]ailure' implies omission— a decision not to introduce evidence when there was an opportunity, or a decision not to seek an opportunity," *Burris,* 116 F.3d at 258, an applicant "fail[s]" to develop the evidence supporting a claim only if he or she relinquishes an opportunity to introduce evidence or neglects to seek such an opportunity.

■ The interpretation of § 2254(e)(2) that we adopt today is consistent with both the language of the statute and the focus on state courts as the principal forum for the resolution of federal claims raised by state prisoners. If deficiencies in the record reflect an omission by the petitioner, the state courts have not been afforded "a full and fair opportunity to address and resolve the claim on the merits," *Keeney,* 504 U.S. at 10, 112 S.Ct. 1715. In the interest of comity, § 2254(e)(2) forbids the federal courts to grant an evidentiary hearing to a petitioner

who has deprived the state courts of a meaningful opportunity to rule on a federal claim.

■ Different concerns are implicated, however, where the lack of factual development is caused by the state's decision to deny an applicant the opportunity to develop the factual basis of a federal habeas claim. Section 2254(e)(2) should not be interpreted to allow a state court to deny a petitioner meaningful review of a federal claim by refusing to permit development of the factual record at the state level. *See Burris*, 116 F.3d at 259 (refusing to read § 2254(e)(2) to allow a state "to insulate its decisions from collateral attack in federal court by refusing to grant evidentiary hearings in its own courts").

■ The Commonwealth urges us to hold that § 2254(e)(2) precludes an evidentiary hearing on Cardwell's claim because Cardwell failed "to develop and proffer facts sufficient to show the necessity of a hearing" in state court. Under Virginia law, entitlement to an evidentiary hearing rests upon the petitioner's ability to show, by affidavit or other evidence, facts that, if true, would demonstrate that the petitioner was illegally detained. *Collison v. Underwood*, 1 Va.App. 443, 339 S.E.2d 897, 898 (1986). According to the Commonwealth, "[t]he state court's refusal of an evidentiary hearing does not deny the petitioner an opportunity to develop facts, but instead recognizes the petitioner's failure to develop and proffer facts sufficient to show the necessity of a hearing."

We conclude that there is a material distinction, however, between a petitioner's failure to seek or to seize an opportunity to present evidence, and an inability to persuade a state court that an evidentiary hearing is required. The lack of factual development in the second instance results not from an omission by the petitioner, but from the state court's determination that an evidentiary hearing is unnecessary.

■ The Commonwealth has further argued that Cardwell "failed to develop the factual basis of his claim" because he did not present to the state court a preliminary evaluation completed by Dr. Hart on August 8, 1995, more than five months before Cardwell filed his state habeas petition, and approxi-

mately four months before the Virginia Supreme Court denied Cardwell's motion to appoint Dr. Hart. According to the Commonwealth, Cardwell's decision not to submit the report is an omission that triggers the § 2254(e)(2) bar. Cardwell has sought to justify the omission by emphasizing that the Virginia Supreme Court denied his motion to appoint Dr. Hart before the state habeas petition was filed.

We do not believe that the prohibition of § 2254(e)(2) is implicated in these circumstances. Although we do not condone Cardwell's decision to exclude the report from his state habeas petition—a report on which Cardwell has relied to support his request for an evidentiary hearing in federal court—neither can we condemn it. Cardwell reasonably may have interpreted the state court's refusal to appoint experts as a rejection of expert evidence, or as an indication that the state court would be unmoved by such evidence in ruling on Cardwell's request for an evidentiary hearing and deciding his claim.

■ Therefore, we hold that § 2254(e)(2) does not prohibit a federal evidentiary hearing on Cardwell's claim of ineffective assistance. Nevertheless, we conclude that the district court properly declined to conduct an evidentiary hearing on Cardwell's claim. *See McDonald*, 139 F.3d at 1059–60 (holding that "even if [the petitioner's] claim is not precluded by § 2254(e)(2), that does not mean he is entitled to an evidentiary hearing—only that he may be.").

An evidentiary hearing is permitted only when the petitioner "alleges additional facts that, if true, would entitle him to relief." *Beaver*, 93 F.3d at 1190. Despite repeated assertions that analysis of his ineffective assistance claim requires an evidentiary hearing, Cardwell has failed to forecast any evidence beyond that already contained in the record, or otherwise to explain how his claim would be advanced by an evidentiary hearing. The district court has already expanded the record to permit the inclusion of the reports completed by Drs. Hart and Hagan. We have long held that the need for an evidentiary hearing may be obviated by such

expansion of the record. *See Raines v. United States,* 423 F.2d 526, 529–30 (4th Cir. 1970). And while Cardwell has argued that the evaluations would be explained by Drs. Hart and Hagan at an evidentiary hearing, he has failed to demonstrate that any explication or clarification of the short and straightforward reports is required. Therefore, we hold that the district court did not err in refusing to grant Cardwell an evidentiary hearing.

## III

■ Before turning to the merits of Cardwell's claim for relief, we must confront another aspect of the AEDPA in determining what standard governs our review of his federal claim. Section 2254(d)(1) provides that an application for a writ of habeas corpus

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . .

28 U.S.C. § 2254(d)(1).

Cardwell maintains that review of his claim is not controlled by § 2254(d)(1) because the perfunctory decision issued by the Virginia Supreme Court did not constitute an "adjudicat[ion] on the merits." According to Cardwell, a claim has not been "adjudicated on the merits" unless the state court has afforded the petitioner an opportunity to develop the factual basis of his claim, and has set forth findings of fact and conclusions of law in its disposition of the claim.

Cardwell's arguments are not persuasive. Cardwell's federal claim was unquestionably "adjudicated"; after briefing by both parties, the Supreme Court of Virginia finally determined that Cardwell was not entitled to relief. *See Black's Law Dictionary* 42 (6th ed.1990) (defining "adjudication" as "[t]he formal giving or pronouncing a judgment or decree in a court proceeding"). It is apparent from the text of the Virginia Supreme Court's order, moreover, that Cardwell's claim was adjudicated "on the merits," and not disposed of on procedural grounds.[4]

■ The parties agree that Cardwell's claim is governed by the well-established legal standards set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, the question with which we are presented is whether the state court decision "rests upon an objectively unreasonable application of established principles to new facts." *Green v. French,* 143 F.3d 865, 870 (4th Cir.1998). Of course, because the state court decision fails to articulate any rationale for its adverse determination of Cardwell's claim, we cannot review that court's "application of clearly established Federal law," but must independently ascertain whether the record reveals a violation of Cardwell's Sixth Amendment right to the effective assistance of counsel. With only one minor change, we adopt the approach taken by the district court, which stated:

> Where, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record. . . . Thus, on the facts of this case, the distinction between *de novo* review and "reasonableness" review becomes [in]significant.

*Cardwell,* 971 F.Supp. at 1015.

## IV

■ To prevail on his claim, Cardwell must show that "(1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.' " *Bell v. Evatt,*

---

4. The order stated:

Applying the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), to petitioner's allegation III, *and finding no merit in other* *complaints raised by petitioner,* the Court is of the opinion that the writ of habeas corpus should not issue as prayed for. It is therefore ordered that the said petition be dismissed.

72 F.3d 421, 427 (4th Cir.1995) (quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052), *cert. denied,* 518 U.S. 1009, 116 S.Ct. 2533, 135 L.Ed.2d 1056 (1996).

The district court concluded that Cardwell had demonstrated deficient performance by his trial counsel, based on counsel's failure "to secure the services of a mental health expert in a timely fashion, and ... to move for a continuance in a timely fashion when counsel's delay jeopardized the ability of the appointed expert to prepare an evaluation in time for trial." *Cardwell,* 971 F.Supp. at 1016. The district court held, however, that Cardwell had failed to demonstrate prejudice as a consequence of counsel's failure to develop and present the mental health evidence during either the penalty phase of trial, or in the trial court's final sentencing review. *Id.* at 1017–19, 1020.

It is not apparent to us that counsel's performance was objectively unreasonable. Although the district court condemned counsel's efforts to secure expert assistance and a continuance as "tardy," we are hard pressed to conclude that counsel was dilatory when less than four months elapsed between Cardwell's indictment in May 1993 and his trial in September 1993, particularly in light of counsel's apparently diligent efforts to obtain the assistance of a mental health expert. McGarvey stated that he had first contacted Dr. Dewey Cornell in June. Dr. Cornell indicated that he needed some time to consider McGarvey's request. After approximately two weeks, Dr. Cornell refused to perform the evaluation. McGarvey then attempted to contact Dr. Richard Elliott. Although McGarvey left several messages for Dr. Elliott, there was no response. Finally, McGarvey stated that Dr. Thomas failed to disclose his vacation plans when he agreed to perform the evaluation; it was only after the appointment was approved by the court on August 3 that McGarvey was advised by Dr. Thomas' office that he would be away for several weeks, and still later when Dr. Thomas informed McGarvey that a month and a half would be required to conduct the analysis.

Even if we assume that counsel's performance fell below an objective standard of reasonableness, however, the record does not reveal any prejudice to Cardwell. The expert evaluations prepared by Drs. Hart and Hagan fail to show a reasonable probability that the jury would have recommended a sentence other than death had expert medical evidence been presented, or that the trial court would have set aside the jury's recommendation.

Dr. Hagan's report was addressed almost exclusively to the question of future dangerousness.[5] According to Dr. Hagan, mental health evidence would have given the jury the information it needed to determine whether Cardwell would present a risk of future dangerousness if sentenced to life in prison. The jury based its recommended sentence of death, however, on a finding that Cardwell's crime was particularly vile, not on a conclusion that Cardwell was likely to commit crimes of violence in the future. The fact that Cardwell was unlikely to present a continuing threat to society if imprisoned for life was not relevant to the question whether the murder of Brown was outrageously or wantonly vile. *See Fitzgerald v. Thompson,* 943 F.2d 463, 470 (4th Cir.1991) (holding that testimony regarding future dangerousness would not affect sentence based on vileness).

Dr. Hart found that Cardwell displayed "low average intellectual capabilities." According to Dr. Hart, the results of the tests administered to Cardwell indicated "brain dysfunction and possible learning disability." He noted that Cardwell had reported "a significant history of alcohol and marijuana abuse," and stated that the "pattern of deficits" he had observed "is similar to that often associated with the chronic effects of alcohol." Dr. Hart concluded:

> Patients with brain dysfunction and/or nonverbal learning disabilities producing this pattern of neuropsychological deficits are more likely to have difficulties accommodating to novel events, adapting

---

5. The report also sets forth a list of "factors typically considered in mitigation," but fails to establish any correlation between Cardwell's mental condition or his background and the listed factors.

to complex situations, and appreciating incongruities or nonverbal cues in social situations.

In a later report, completed after Dr. Hart reviewed Cardwell's medical and educational records, he commented:

> Mr. Cardwell undoubtedly experienced difficulties in his functioning and negative feedback from others as a consequence of his learning disability without having an adequate explanation available to him. One likely consequence of such life experience is a lowering of self-esteem and sense of competence.

Dr. Hart's evaluation, though it may create a more human portrait of Cardwell, does nothing to diminish Cardwell's moral culpability for a calculated and merciless killing. Cardwell, who instigated the encounter and devised the scheme to lure Brown to his apartment, displayed no difficulty "accommodating to novel events" or "adapting to complex situations," but manifested both cunning and cruelty. There is no reasonable probability that mental health evidence of the type presented in Dr. Hart's report would have affected the jury's conclusion that Cardwell should receive the death penalty for his gruesome crime.

We, therefore, affirm the district court's denial of an evidentiary hearing, and of the writ of habeas corpus.

The judgment is accordingly

*AFFIRMED.*