**Derek Rocco BARNABEI, Petitioner–Appellant,**

v.

**Ronald J. ANGELONE, Director, Virginia Department of Corrections, Respondent—Appellee.**

No. 99–16.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 2000

Decided June 5, 2000

---

**ARGUED:** Linda Ceilia Goldstein, Covington & Burling, New York, New York, for Appellant. Robert H. Anderson, III, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** Sean Hecker, Covington & Burling, New York, New York; Timothy C. Hester, Seth A. Tucker, Amy L. Levine, Gerard N. Magliocca, Keith L. Lieberthal, Covington & Burling, Washington, D.C., for Appellant. Mark L. Earley, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Chief Judge WILKINSON and Senior Judge HAMILTON joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

On June 14, 1995, a Virginia jury convicted Derek R. Barnabei of raping and murdering Sarah Wisnosky, a 17–year–old student at Old Dominion University. The following day, the same jury sentenced Barnabei to death. After exhausting his state remedies, Barnabei filed a petition for federal habeas relief, which the district court dismissed. We deny Barnabei's request for a certificate of appealability and affirm the dismissal of the petition.

I.

On Barnabei's direct appeal from his conviction, the Supreme Court of Virginia described the facts of this case:

On September 22, 1993, shortly after 6:00 p.m., Wisnosky's nude body was discovered floating in the Lafayette River, in the City of Norfolk. Nearby, the police found a leather shoe, later identified as Wisnosky's, on one of the steps leading down to the river. The police also found a washcloth, which appeared to be bloodstained.

An autopsy, performed by a state deputy medical examiner, revealed that Wisnosky had sustained at least 10 severe blows to the back and right side of her head, fracturing her skull. The blows had been inflicted by a heavy, blunt object, such as a ball peen hammer. The autopsy further revealed that Wisnosky had sustained bruising to her abdomen, which the examiner testified could have been caused by a blow to Wisnosky's abdomen or by the assailant's kneeling on her "to hold [her] in place." Wisnosky also had sustained bruises to her neck and larynx, and petechiae were found on her face which, according to the medical examiner, were "a manifestation of mechanical asphyxia." These findings suggested to the examiner that Wisnosky had been "manually strangled."

Additionally, the medical examiner found bruising on the introitus of Wisnosky's vagina and a half-inch tear of her anal opening. The examiner opined that the bruising had been sustained prior to Wisnosky's death and that the anal tear had been inflicted "very close to the

time of her death." The examiner also opined that such a tear is usually caused by "forcible stretching."

The examiner further opined that Wisnosky's death was not caused by drowning although a "little fluid" was found in her lungs. He, however, could not rule out the possibility that Wisnosky may not have been dead when her body was put into the water. The "primary cause" of Wisnosky's death, according to the medical examiner, was the head injuries. The mechanical asphyxia was a contributing factor.

Wisnosky was a 17–year–old Caucasian and a student in her first year at Old Dominion University (ODU). Nicki Vanbelkum, Wisnosky's dormitory roommate, last saw Wisnosky alive on the afternoon of September 21, 1993. Vanbelkum and Wisnosky had planned to meet later that day, but Wisnosky did not appear.

Barnabei, also a Caucasian, first arrived in the Norfolk–Virginia Beach area in August 1993. He identified himself to others as "Serafino" or "Serf" Barnabei and claimed to have been a member of the Tau Kappa Epsilon (TKE) fraternity at Rutgers University. Soon thereafter, Barnabei began to associate with members of TKE at ODU. He rented a room in a house that was occupied by four other young men, who were either past or present students at ODU.

Barnabei became acquainted with Wisnosky, and the two attended a number of functions at the rooming house. On several occasions, Wisnosky spent the night with Barnabei.

On one of those occasions, Wisnosky and Vanbelkum went to Barnabei's rooming house for a "toga party," conducted by the TKE fraternity. Wisnosky became intoxicated and refused to leave the party with Vanbelkum. Barnabei appeared to shun Wisnosky throughout the party, and he told Thomas Walton, a TKE member, to "keep [Wisnosky] away from him because he was trying to hook up with someone else." Walton and Daniel Paul Wilson, another student, kept Wisnosky company on the front porch of the house. When Walton and Wilson asked Wisnosky about her relationship with Barnabei, she remarked, "He is all right, but I have had better." About 5:00 a.m., Walton left Wisnosky asleep in Barnabei's bed, and, later that morning, Wisnosky returned to her dormitory room without incident.

The following day at a fraternity meeting, when Barnabei "was bragging about his sex life" and Walton told those in attendance about Wisnosky's remark, Barnabei became agitated. When those present began to laugh and tease him, he denied that he had had sexual intercourse with Wisnosky, stating that they had had only oral sex.

On September 22, 1993, about 1:00 a.m., William Rolland Gee, III, a TKE pledge, drove Barnabei from a TKE pledge meeting to Barnabei's rooming house. Wisnosky was in Barnabei's room when Gee departed about 45 minutes later.

Sometime in the early hours of September 22, Michael Christopher Bain, who lived in the bedroom directly above Barnabei's, began hearing very loud music emanating from Barnabei's room. Bain first stomped on the floor in an unsuccessful effort to get Barnabei to reduce the volume of the music. Bain and David Wirth, another roomer in the house, then went downstairs. They pounded on Barnabei's door for about five minutes, but no one answered, and they tried to open the door, but it was locked.

Meanwhile, Troy Manglicmot, another occupant of the house, was suddenly awakened when Barnabei rushed into his room. Speaking in a "strong, forceful tone," Barnabei demanded that Manglicmot move his vehicle because it was blocking Barnabei's car in the driveway next to the house. Barnabei took Manglicmot's car keys, but he could not start the vehicle. Manglicmot then moved his vehicle, and Barnabei began to back his car out of the driveway. After striking

the side of the house next door and nearly colliding with Manglicmot's vehicle and Wirth's truck, Barnabei "pulled out real fast" onto the street and drove away.

That same morning, about 2:30 a.m., Justin Dewall, another roomer in the house, returned to the house and was unable to find his dog. In the course of looking through the house for the dog, he knocked on Barnabei's door. When Barnabei opened the door slightly, Dewall observed that Barnabei was "stark naked" and that Barnabei's face was expressionless. Barnabei appeared "wide-eyed, open-mouthed, and he wasn't focusing on [Dewall] when he was looking at [him]."

When Wirth left the house about 7:30 that morning, he saw Barnabei asleep on a couch in the living room. Wirth asked Barnabei why he was not sleeping in his room, and Barnabei responded that "it was a long, f___ed-up story." As Wirth walked to his truck, he found a shoe near the rear of Barnabei's car. Wirth threw the shoe, which was later identified as belonging to Wisnosky, toward the back porch.

About 9:30 a.m., Barnabei telephoned Eric Scott Anderson, another TKE pledge, and asked Anderson to bring him a blanket. When Anderson arrived at Barnabei's door, he noticed that Barnabei's waterbed, unlike on a past occasion, had no bed sheets.

In the early afternoon of September 22, Barnabei was seen by Dewall's girlfriend carrying a duffle bag and a surfboard from his bedroom. About 2:45 that afternoon, Barnabei offered Richard Patton, a TKE pledge, a ride to a fraternity sporting event. Before departing, Barnabei told Patton that he had been carrying a surfboard in his car and asked if Patton could take it to his room "because he was tired of carrying it around in his car." Patton took the surfboard to his room and put it in a closet. Upon leaving in Barnabei's car, Patton noticed "a really bad smell." Barnabei told him that the smell proba-

bly came from his "bag of laundry," a large, closed duffle bag, in the backseat of the car. Also during that afternoon, Barnabei borrowed, or tried to borrow, money from Patton and others.

About 5:30 or 6:00 p.m., he called Anderson and asked if Anderson had "heard anything." When Anderson inquired as to what Barnabei was referring, Barnabei replied, "[L]ike, oh, nothing." Barnabei then stated that he was "going away for a couple days to work with [his] dad." Barnabei went to Towson, Maryland and later to Ohio, where he was arrested in December 1993.

On September 23, several police officers went to Barnabei's rooming house, where they recovered Wisnosky's other shoe, which appeared to be bloodstained. They also recovered a pair of white socks from atop a trash can beside the house and a towel from the rear of the house next door. The towel exhibited dark red stains.

After interviewing the occupants of the house, the police obtained a search warrant and proceeded to search Barnabei's room, which "appeared to have been abandoned." The police found stains on Barnabei's waterbed and on one of the bedroom walls, and a damp, red stain was discovered beneath a carpet. Stains also were found on the surfboard which was retrieved from Patton's bedroom. In addition, the police recovered a handwritten note which stated, "Women just don't get it."

A state forensic serologist found sperm on Wisnosky's vaginal swabs. She also found blood underneath Wisnosky's fingernails, on one of her shoes, on the surfboard, and on the washcloth and towel, and hairs and fibers on the socks, towel, and washcloth.

A state DNA analyst conducted an RFLP DNA analysis of various samples. She testified that blood recovered from the waterbed frame matched that of Wisnosky and that the chances were one in 202,000 that the blood came from a

Caucasian other than Wisnosky. She also stated that the chances were one in 972 million that Barnabei did not contribute the sperm found on the vaginal swabs. The analyst also determined that the stain found under the carpet in Barnabei's room was human blood.

Another DNA analyst conducted a PCR DNA analysis of various samples. She determined that the blood recovered from the surfboard, shoe, wall, and waterbed was consistent with Wisnosky's blood type. She testified that only 3.9 percent of the Caucasian population has the "HLA DQ type" found in these samples. She also stated that the sperm fraction recovered from the vaginal swabs was consistent with Barnabei's blood type and that only 1.9 percent of the Caucasian population has the HLA DQ type found in this sample.

An expert on hair and fiber analysis determined that the socks recovered contained four pubic hairs. These hairs were similar to samples taken from Wisnosky and dissimilar to Barnabei's samples "in all identifiable microscopic characteristics."

*Barnabei v. Commonwealth*, 252 Va. 161, 477 S.E.2d 270, 272–75 (1996) (footnotes omitted).

The Supreme Court of Virginia upheld Barnabei's conviction and sentence on direct appeal and denied Barnabei's petition for rehearing. After the Supreme Court of the United States denied Barnabei's petition for a writ of certiorari, *Barnabei v. Virginia*, 520 U.S. 1224, 117 S.Ct. 1724, 137 L.Ed.2d 845 (1997), Barnabei filed for state habeas relief. In a summary order, the Supreme Court of Virginia dismissed that petition, finding certain of Barnabei's claims to be procedurally defaulted and others to be without merit.

Barnabei then petitioned the district court for federal habeas relief, challenging his conviction and sentence on numerous grounds. The district court considered most of Barnabei's claims on the merits, including those that the Supreme Court of Virginia had found to be procedurally

barred under the rule of *Hawks v. Cox*, 211 Va. 91, 175 S.E.2d 271 (1970) (previous determination on an issue by either state or federal court will be considered conclusive when issue is raised on state habeas). The district court deemed the remainder of Barnabei's claims to be procedurally defaulted under the rule of *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974) (arguments not raised at trial and on direct appeal cannot be raised for first time on habeas review). Finding that Barnabei could not show cause for these defaults, and rejecting his other challenges on the merits, the district court dismissed the petition.

On appeal, Barnabei raises five challenges to his conviction and sentence in state court. First, Barnabei contends that he was denied effective assistance at trial by his counsel's failure to contest thoroughly the Commonwealth's forensic evidence of rape. Second, he maintains that he was denied effective assistance by his counsel's failure to object to the verdict form with which the jury sentenced him to death. Third, he argues that the "vileness" aggravating factor for which a Virginia jury can impose a sentence of death is unconstitutionally vague. Fourth, he asserts that the admission of testimony by his ex-wife during the penalty phase violated his right to due process. Fifth, Barnabei contends that the trial court was constitutionally required to inform the jury that a life sentence would have rendered him ineligible for parole for twenty-five years. Barnabei also argues that the district court abused its discretion in refusing to order forensic testing of certain evidence, and that the district court applied an incorrect standard of review in evaluating his claims. We consider each argument in turn, beginning with the challenge to the standard of review.

## II.

Under 28 U.S.C. § 2254(d) (1994 & Supp. IV 1998), as amended by the Antiterrorism and Effective Death Penalty Act

(AEDPA), a federal court may grant an application for habeas relief on a claim that was previously adjudicated on the merits in state court only if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The Supreme Court recently explained that the requirement that the state court's application of federal law have been "unreasonable" means that it must have been more than merely "incorrect" in the estimation of the federal habeas court. *See Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1495, 1521–22, 146 L.Ed.2d 389 (2000).* The Court emphasized, however, that the "unreasonable application" inquiry is an analysis of the *objective* reasonableness of the state court's application of clearly established federal law. *See id.* at 1521. "The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 1521–22.

■ Barnabei argues that, because the Supreme Court of Virginia cited little federal law in its rejection of his claims on direct appeal and no federal law in its summary order on state habeas, the district court should have reviewed his federal habeas claims under a de novo standard of review. We have previously recognized that the deferential standard of review mandated by § 2254(d), as amended, cannot easily be applied when, as for many of the claims raised by Barnabei here, "'there is no indication of how the state court applied federal law to the facts of a

case.'" *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.1998) (quoting *Cardwell v. Netherland*, 971 F.Supp. 997, 1015 (E.D.Va.1997)). On such claims, we have held, the federal habeas court "must independently ascertain whether the record reveals a violation" of the petitioner's constitutional rights. *Id.*

■ Nonetheless, we have consistently recognized that even a perfunctory state court decision constitutes an adjudication "on the merits" for purposes of federal habeas review. *See, e.g., Wright v. Angelone*, 151 F.3d 151, 156–57 (4th Cir.1998). Thus, in such instances, de novo review by a federal habeas court remains inappropriate under § 2254(d). *See, e.g., Weeks v. Angelone*, 176 F.3d 249, 259 (4th Cir.1999).

Here, we find that the district court, by carefully reviewing each of Barnabei's claims, fulfilled its obligation under *Cardwell* and our other precedents. The district court "independently ascertain[ed] whether the record reveals a violation" of Barnabei's rights. *Cardwell*, 152 F.3d at 339. Although the district court misquoted *Cardwell* when it described the difference between de novo review and the "reasonableness" standard mandated by § 2254(d) as "less significant," rather than "insignificant," when "there is no indication of how the state court applied federal law," *id.*, we have no hesitation in concluding that the district court struck the proper balance—recognizing the legal effect of the prior state court adjudication while independently reviewing the issues raised. The district court carefully considered both the factual and legal bases for Barnabei's claims while recognizing the constraints on its authority imposed by § 2254(d).

### III.

■ In his principal argument to this court, Barnabei maintains that he was de-

---

* The parties have moved to file various supplemental memoranda to address *Williams,* which was issued after oral argument in this case, and other matters. We grant their motions and have considered all of their supplemental memoranda.

nied his Sixth Amendment right to effective assistance of counsel by his trial counsel's failure to present medical evidence that assertedly would have rendered the Commonwealth's evidence of rape significantly less compelling. Specifically, Barnabei argues that his trial counsel should have presented evidence that a vaginal bruise, like that apparently sustained by Ms. Wisnosky prior to her death, can occur as a result of consensual sex and other, non-sexual, activities. Barnabei also argues that his trial counsel should have presented evidence contesting the finding of a vaginal bruise in the Commonwealth's forensic examination. The evidence surrounding the vaginal bruise holds special significance here, because Barnabei's capital murder conviction, and thus his eligibility for the death penalty, is predicated on the jury's finding that he murdered Sarah Wisnosky during the commission of rape. *See* Va.Code Ann. § 18.2–31(5) (Michie Supp.1999).

■ We review a claim of ineffective assistance of counsel under the two-prong standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, Barnabei must show that "(1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) 'there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bell v. Evatt,* 72 F.3d 421, 427 (4th Cir. 1995) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

Barnabei cites two medical texts, several studies, and the affidavits of two physicians, all indicating that the occurrence of a vaginal contusion may be as consistent with consensual sex as with rape, and that such contusions can be caused by other activities as well. *See* Brief of Appellant at 21–24. One of these physicians opines in his affidavit that even the existence of a contusion could not be presumed from the Commonwealth's evidence without further forensic testing. *See id.* at 24.

Barnabei argues that trial counsel's failure to consult medical texts and experts was both objectively unreasonable and prejudicial under *Strickland.* According to Barnabei, if counsel had reviewed the medical literature, he would have conducted a more effective cross-examination of the Commonwealth's principal witness on the forensic evidence, Dr. Faruk Presswalla; he would have decided to present independent evidence rebutting Dr. Presswalla's conclusions; and he might have been able to formulate a proffer sufficient to convince the trial court to appoint a defense expert.

The district court found that trial counsel's decision not to investigate Dr. Presswalla's medical findings was "unreasonable" under *Strickland.* The court concluded, however, that Barnabei could not demonstrate that he was prejudiced by counsel's deficient performance and therefore could not make the required showing under *Strickland*'s second prong. Assuming, without deciding, that the district court correctly found that trial counsel's performance was unreasonable, we agree with the district court that Barnabei cannot show prejudice under the second prong of *Strickland.*

The evidence presented at trial, taken as a whole, admits of no real uncertainty on the question of whether Barnabei raped Sarah Wisnosky. This evidence included not only the vaginal bruise, but the anal tear incurred by Ms. Wisnosky, expert testimony that the anal tear occurred close to the time of her death, testimony that Ms. Wisnosky was seen in Barnabei's room shortly before 2:00 a.m. on the night of her murder, forensic evidence that Ms. Winosky's blood matched that found on Barnabei's waterbed frame, the presence of Barnabei's semen in vaginal swabs taken from Ms. Wisnosky's body, and Barnabei's own admission that he had had sex with Ms. Wisnosky on the night of her death. Furthermore, as the Commonwealth argues, the jury could well view Ms. Wisnosky's murder and the brutality of that murder as

fatally undermining Barnabei's claim that his sexual contact with Ms. Wisnosky shortly before her murder was consensual. Although Barnabei apparently maintains his complete innocence, he raises no challenge here to the jury's determination that he committed the brutal murder.

Barnabei essentially asks us to view each piece of evidence in isolation. Placing special emphasis on the vaginal bruise, Barnabei contends that each item of evidence, considered independently, could plausibly be consistent with consensual sex, rather than rape.

The evidence cannot be approached in this way. It is possible that a woman could incur a vaginal bruise during consensual sex, or from some other cause. It is possible that a woman could incur an anal tear shortly before she was brutally murdered but not have been vaginally raped around the same time. It is possible, too, that she could have consensual sex with a partner who, all the evidence indicates, brutally murdered her shortly thereafter. And it is possible that the victim's blood could be found on the convicted murderer's bed, and that the murderer's semen could appear in a vaginal swab taken from her dead body, without a rape having occurred. However, we cannot accept Barnabei's contention that *all* of these extraordinarily unlikely circumstances converged in this case. Taken together, the evidence points overwhelmingly to Barnabei's guilt on both rape and murder charges.

We also note, as did the district court, that Barnabei's trial counsel was able to elicit on cross-examination a concession from Dr. Presswalla that a vaginal bruise could be consistent with other causes aside from nonconsensual sex. This further weakens Barnabei's claim that he. was prejudiced by counsel's failure to conduct an adequate cross-examination.

In view of all of the above, we conclude that Barnabei was not prejudiced by trial counsel's performance in contesting the Commonwealth's forensic and DNA evidence of rape.

## IV.

Barnabei next argues that he was denied effective assistance at trial by his counsel's failure to object to the verdict form with which the jury sentenced him to death.

In Virginia, a defendant may be sentenced to death if the Commonwealth proves beyond a reasonable doubt the existence of one of two aggravating factors—either "a probability ... that he [the defendant] would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Va.Code Ann. § 19.2-264.4(C) (Michie Supp.1999). In Barnabei's trial, the jury submitted its verdict in the penalty phase using a verdict form stating that it had unanimously found the first aggravating factor (future dangerousness) "and/or" the second aggravating factor (vileness). Barnabei contends that the use of the conjunction "and/or" permitted the jury to sentence him to death without unanimity on either one of the two aggravating factors. He maintains that his counsel was prejudicially ineffective for failing to object to the wording of the "and/or" verdict form.

Barnabei's underlying contention, that he is entitled to juror unanimity on a specific aggravating factor before being sentenced to death, appears to be based entirely on state law. See Reply Brief at 22–25 (citing the Virginia Constitution and Virginia cases). The Supreme Court of Virginia, on state habeas review, found "no merit" in Barnabei's contention that counsel's failure to object to the verdict form amounted to ineffective assistance of counsel. Thus, Barnabei's argument here essentially asks this court to reverse the Supreme Court of Virginia on the question of whether it was objectively unreasonable for an attorney in Virginia to fail to make an objection based purely on Virginia law.

472

We think that this is an issue on which our deference to the state court should be at its zenith.

Moreover, even if we were permitted to consider the question de novo, and as a federal habeas court we are not, Virginia precedent does not appear to support Barnabei's claim. Rather, it appears that the Supreme Court of Virginia has previously condoned the use of an "and/or" verdict form like the one in this case and declined to overturn a death sentence when it could not be determined with certainty whether the jury unanimously agreed on either of the two aggravating factors. *See Turner v. Commonwealth,* 221 Va. 513, 273 S.E.2d 36, 45 n. 12 (1980) (finding no prejudicial error, but noting that "it would accord with better practice to determine with certainty the basis for the jury's sentence").

Thus we can only conclude that Barnabei's trial counsel was not ineffective under *Strickland* for failing to object to the "and/or" verdict form under Virginia law.

### V.

Barnabei contends that the second of the above-quoted aggravating factors under which a death sentence may be imposed—the "vileness" aggravator—is unconstitutionally vague. We have rejected constitutional challenges to Virginia's "vileness" aggravator on several occasions. *See Breard v. Pruett,* 134 F.3d 615, 621 (4th Cir.1998); *Bennett v. Angelone,* 92 F.3d 1336, 1345 (4th Cir.1996); *Tuggle v. Thompson,* 57 F.3d 1356, 1371–74 (4th Cir.), *rev'd on other grounds,* 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995). These recent precedents require rejection of Barnabei's similar challenge.

### VI.

■ Barnabei asserts that he was denied due process during the penalty phase of his trial when his ex-wife Paula Barto testified that, on one occasion, Barnabei attempted to force her to have anal sex with him. Barnabei had asked the prosecution to provide notice of any evidence of unadjudicated criminal conduct that it might offer, and the prosecution, in providing that notice three weeks before trial, described "a continuous course of threatening and assaultive conduct against the former Paula Argenio Barnabei." Barnabei's claim appears to be based in part on unfair surprise, and in part on a theory of misrepresentation by the prosecution. *See Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).

We do not agree with the Commonwealth that Barnabei procedurally defaulted this claim. Barnabei's trial counsel lodged a strenuous and contemporaneous objection to Barto's testimony, noting with skepticism that Barto's account of attempted forcible anal intercourse "just happens to fit neatly into the proof they produced at the time of the trial." Barnabei's counsel asked the trial judge to strike the testimony and to declare a mistrial. The Commonwealth urges us to view the objection as having been based solely on state law, but the transcript indicates an objection going to the fundamental fairness of the admission of Barto's testimony. We are not barred from considering this argument simply because trial counsel, acting on the spur of the moment, did not cite a particular constitutional provision. We note that in assigning error on direct appeal, Barnabei explicitly linked the admission of Barto's testimony to a violation of his federal constitutional rights, and the Supreme Court of Virginia rejected the argument on the merits, albeit without citing federal law. Under these circumstances, it is appropriate to consider Barnabei's argument on the merits.

■ Having done so, however, we must conclude that Barnabei cannot prevail. On his claim of unfair surprise, *Gray* controls. In that case, the habeas petitioner, who had been convicted and sentenced to death for capital murder, asked that his sentence be vacated because, during the penalty phase, the prosecution had introduced crime scene and medical evidence linking the defendant to an earlier, unsolved double murder. *Gray,* 518 U.S. at 156–57, 116

S.Ct. 2074. The prosecution had previously assured petitioner's counsel that it would introduce only testimony, but not other sorts of evidence, regarding the earlier murders. *Id.* The Supreme Court held that the petitioner's claim was barred by the "new rule" doctrine enunciated in the plurality opinion in *Teague v. Lane,* 489 U.S. 288, 309–10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Under this doctrine, "habeas relief is appropriate only if 'a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.' " *Gray,* 518 U.S. at 166, 116 S.Ct. 2074 (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)). The Court viewed Gray's argument as a claim "that due process requires that he receive more than a day's notice of the Commonwealth's evidence" and that "due process required a continuance whether or not [the defendant] sought one, or that, if he chose not to seek a continuance, exclusion was the only appropriate remedy for the inadequate notice." *Gray,* 518 U.S. at 167, 116 S.Ct. 2074. The Court concluded that "only the adoption of a new constitutional rule could establish these propositions." *Id.*

In so holding, the Court distinguished the principal case upon which Barnabei relies, *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In *Gardner,* the Court vacated a death sentence that had been imposed, in part, on the basis of information in a presentence investigation report to which the petitioner had been wholly denied access. The *Gray* Court observed that, in *Gardner,* the petitioner "literally had no opportunity to even see the confidential information, let alone contest it. Petitioner in the present case, on the other hand, had the opportunity to hear the testimony ... in open court, and to cross-examine" the witnesses who offered it. *Gray,* 518 U.S. at 168, 116 S.Ct. 2074. The Court explicitly rejected as overly general the constitutional rule that the dissent would have derived from *Gardner* and other cases—"that 'a capital de-fendant must be afforded a meaningful opportunity to explain or deny the evidence introduced against him at sentencing.' " *Id.* at 169, 116 S.Ct. 2074 (quoting *id.* at 180, 116 S.Ct. 2074 (Ginsburg, J., dissenting)).

We recognize that there are certain factual differences between Barnabei's situation and that of the petitioner in *Gray.* If we were to accept Barnabei's contention that the Commonwealth's description of "a continuous course of threatening and assaultive conduct" was insufficient to put Barnabei on notice of Barto's testimony (despite being offered three weeks before trial), then Barnabei effectively got no notice at all, as opposed to the one day's notice afforded to the petitioner in *Gray.* On the other hand, the evidence introduced in *Gray*—that the petitioner had committed a notorious and brutal double murder—was significantly more explosive than the evidence introduced here.

Ultimately, we do not think these differences are sufficient to permit us to disregard *Gray.* Barnabei asks us to vacate his sentence on the basis of essentially the same constitutional rule urged upon the Court in *Gray.* The Supreme Court clearly and unequivocally (albeit by a narrow vote) refused to adopt such a rule in *Gray.* Barnabei points to no intervening precedent that would allow us to ignore *Gray*'s holding or that establishes that due process requires advance notice of the specific evidence of unadjudicated conduct that the prosecution intends to introduce during the penalty phase of trial proceedings.

■ On Barnabei's misrepresentation claim, even if the record supported his suggestion of deliberate vagueness by the prosecution, we would not vacate his sentence on these facts. Here, the Commonwealth did provide Barnabei with notice that it would introduce evidence of "a continuous course of threatening and assaultive conduct against the former Paula Argenio Barnabei." We are aware of no established constitutional rule that the prosecutor would have violated had he

known the specifics of Paula Barto's testimony and failed to disclose them, however troubling such a practice might be. Such deliberate vagueness would not be equivalent to the conduct of the prosecutor in *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam), cited by Barnabei. In that case, the prosecutor engaged in "deliberate deception of court and jury" by knowingly introducing perjured testimony at trial, and the Court found that the defendant's rights had been infringed. *Id.* at 112, 55 S.Ct. 340. *Mooney*, therefore, does not provide a foundation for Barnabei's argument. The facts, even as alleged by Barnabei, do not support a finding of a constitutional violation based on prosecutorial misrepresentation.

## VII.

■ Barnabei argues, based on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that his due process and Eighth Amendment rights were violated when the judge refused to instruct the jury that, if sentenced to life imprisonment, Barnabei would not be eligible for parole for twenty-five years. Under circuit precedent, a *Simmons* jury instruction is required only when the defendant is parole ineligible. We have read *Simmons* to apply only when the prosecution argued for the death penalty on the basis of the defendant's "future dangerousness" and, under state law, a life sentence for the defendant would be without possibility of parole. *See, e.g., Wilson v. Greene*, 155 F.3d 396, 407–08 (4th Cir. 1998). Because Barnabei would have been eligible for parole in twenty-five years, circuit precedent dictates that the *Simmons* rule does not apply in this case.

## VIII.

■ Barnabei contends that the district court abused its discretion by refusing to order additional DNA and forensic testing. He also contends that trial counsel was ineffective under *Strickland* for failing to seek additional testing. Barnabei focuses particularly on the Commonwealth's failure to test the blood on the fingernail clippings taken from Sarah Wisnosky—presumably the blood of her attacker. In various *pro se* filings, Barnabei also maintains that "twenty some odd hairs," a bloody pair of men's moccasins, and two bloody towels should have been tested for DNA evidence and were not.

Under Rule 6(a) of the Rules Governing § 2254 Cases, a district court has the discretion to order additional discovery in a § 2254 case "for good cause shown." The district court did not abuse its discretion in refusing to order the discovery requested here because Barnabei has not met this required "good cause" standard. In the cases cited by Barnabei, additional discovery would have offered compelling support for a credible alternative theory of the crime for which the petitioner had been convicted. *See Jones v. Wood*, 114 F.3d 1002 (9th Cir.1997) (reversing denial of discovery of forensic evidence when there was specific evidence linking another suspect to the murder); *Toney v. Gammon*, 79 F.3d 693 (8th Cir.1996) (reversing denial of discovery of DNA evidence in rape case in which both the victim and a nearby witness offered consistent physical descriptions of the attacker that did not match habeas petitioner). Barnabei can make no such similar "good cause" showing.

■ We also find that Barnabei's trial counsel was not ineffective in failing to seek additional forensic testing. The Commonwealth offered a significant amount of forensic and DNA evidence at trial—all of it, at least arguably, implicating Barnabei. We cannot conclude, under these circumstances, that trial counsel's failure to seek additional testing met the standard of ineffectiveness under *Strickland*. Thus Barnabei has stated no constitutional claim requiring additional DNA testing.

## IX.

For the foregoing reasons, we deny the request for a certificate of appealability and affirm the judgment of the district

court dismissing the petition for a writ of habeas corpus.

*AFFIRMED*